Nicholson, C. J.,
delivered the opinion of the • Court.
In 1849, the real estate of John Ross, deceased, was sold by order of the Chancery Court, for the purpose of partition amongst his heirs. At the sale, which occurred on the 2d of October, 1849, the tract of land in controversy, was bid off by defendant, Elliot H. Gass, at the price of $729, for which he executed his two notes, at one and two years, with complainant, his *615 mofclier, as one of the securities. The notes were paid at or before maturity, by defendant, Elliott H., and a decree made vesting him with the title. In 1865, attachments issued against defendant, Elliott H., in favor of J. H. Weems and others, which were levied on said land, and the same was seld and bid off, at the Sheriff’s sale, by said Weems, at the amount of his debt, and afterwards redeemed from him by Anderson, and then from Anderson by defendant, Carter, but no deed was made by the Sheriff to either of said parties, before the bill in this case was filed.
Complainant files her bill against Elliott H. Gass and Alfred Carter, claiming that when defendant, Elliott, her son, purchased the land, he purchased for her, and that she furnished the money with which the land was paid for; and, therefore, that she is entitled to the same, or at least so much thereof, as she paid for, by way of resulting trust; she calls upon defendant, Carter, to produce and file the record, by which he claims title to the land.
Defendant, Elliott, makes no answer, and the bill as to him is taken for confessed. Defendant, Carter, answered, and denies that his co-defendant, Elliott, purchased the land for complainant, or that she paid any portion of the purchase money, and insists that she has no claim, legal or equitable, to the land. He says that the creditors of defendant, Elliott, attached the land, had it sold, and that the same was purchased by Weems, one of the creditors; that it was redeemed from him by Anderson, another creditor; and then that it was redeemed by himself as creditor; but he fails to produce *616 the record of the judgment under which tlie land was sold, or the judgment of any of the redeeming creditors, or his own judgments on which he claims to have redeemed; nor does he claim to have any deed from the Sheriff. All that he does produce, is a copy of a receipt of his own, filed with the Clerk of the Circuit Court of Greene county, showing that he paid the prior bids, amounting to about $225; and that he then receipted defendant, Elliott, for a judgment against him amounting to about $400. This receipt of his own, so filed with the Clerk, is all the evidence of his title.
The first question presented upon the pleadings, is whether defendant, Elliott, purchased the land for complainant, or for himself, or for both. On this question the proof is voluminous, and much of it irrelevant and incompetent, but after a careful examination of all the testimony that is legal, we are satisfied that the purchase was made by defendant, Elliott,' for complainant and himself, in pursuance of a previous understanding to that effect between them. The next question is, how was the land paid for; whether with the money of complainant in whole or in part? On this question the evidence is entirely satisfactory that at least as much as one-half of the price, that being the first note, was paid by ' defendant, Elliott, with complainant’s motiey. She is shown to have received more than that amount from her father’s estate about the time the first note was paid. He is shown to have lived with complainant, to have had charge of her business and her papers and her money, she being old, speechless from paralysis, and of weak intellect. The evidence does not satisfy us that *617 the other half of the purchase money, that being the second note, was' paid with her money, though the proof tends to that conclusion. It follows, that when defendant, Elliott, took the title to the whole tract in his own name, he held at least the one-half thereof as trustee for complainant; and upon this state of the facts as against defendant, Elliott, she would be entitled to relief to the extent of the land paid for by her.
But it is insisted for defendant, Carter, that some time, after defendant, Elliott, obtained the title to the land, complainant recognized his title to the whole tract, by agreeing to buy from him about two hundred acres thereof, and that he executed to her a bond for title, when she should pay therefor; and it is further insisted, that after she had failed to make the payment for the two hundred acres, the bond was abandoned and canceled, and that she agreed to take, and did receive, his note for $325, the amount she had paid to him on the land, and that defendant, Elliott, afterwards paid off and took up said note. If these allegations are sustained by the proof, they are fatal to complainant’s claim for relief.
Complainant alleges in her bill, that shortly after defendant, Elliott, purchased the land, he executed his bond to make complainant a title to about two hundred acres of the land, in consideration of her money used in said purchase; that this bond, by some means unknown to complainant, has been lost or destroyed. In answer to this allegation, defendant, Carter, says that he did hear that said Elliott agreed to sell his mother a portion of said land, and that some writings were drawn — a bond and a note; and he heard, also, that they had been *618 abandoned. The draftsman of the bond was examined as a witness, and he certifies that, in 1854, he wrote the bond, from Elliott Gass to his mother, to make her a title to a portion of the land, and that she executed her note to him for the purchase money. He thought the amount was about $400; that there were two witnesses to the bond, but he could not recollect whether there were witnesses to the note. He saw nothing unusual in complainant’s condition at the time.
In order to determine, whether the bond was executed, as alleged by complainants, as an acknowledgment of defendant Elliott’s obligation to convey to her a portion of the land, in consideration of the money paid by her towards its purchase, or whether it was a purchase by her from defendant, Elliott, as testified to by the witness, it becomes necessary to look closely to the relations of the parties, and to the facts and circumstances which occurred soon after the bond was executed. It is in the proof, that the parties lived together, and that defendant, Elliott, had charge of all his mother’s business. He had control of her papers and of her money. The most intimate fiduciary relations are shown to have existed between them.
It is in proof that, on the 12th of January, 1850, complainant receivéd of the administrator' of her father’s estate, $400; on the 6th of February, 1850, she received $200, and on the 25th of September, 1862, she received $60. It is in proof that, on the 31st of July, 1850, defendant,' Elliott, paid $200 on the first land note, and on the 6th of October, 1850, he paid the balance, about $165. On the 15th of October, 1851, he paid $306 *619 on the second note; and, within a few days, he filed complainant’s receipt for her distributive share of the second instalment from the land sale, for $59, which satisfied the second note. It is also in proof that, in 1858 and 1859, complainant received, for her distributive share of other lands sold, $904. It is thus shown that, at the time the first land note was paid off, complainant had the money more than sufficient to pay it; whilst the proof is abundant, that defendant, Elliott, was a young man without means, except one or two horses; living with complainant, and having the control of her business and her means. In addition to all this, it is in evidence, by the members of the family, white and colored, as well as by others outside of the family, that defendant, Elliott, admitted, repeatedly, for years, and as late as 1861, that he paid for the land with complainant’s money. The conclusion is irresistible, that, wffien the bond was given by defendant, Elliott, he was indebted to complainant for her money, used in paying for the land, at least as much as the first land note, and $59 on the second note, and that whatever was the form of the transaction as to the bond, the substance of it was, that defendant, Elliott, was to convey to complainant about two hundred acres of land, on account of her money having been used in its purchase and. payment. This conclusion is strengthened by the fact, that no such note as that referred to by the witness is ever after-wards heard of or referred to. But it is next insisted, for defendant Carter, that the bond was soon afterwards abandoned by complainant, and that she took defendant, Elliott’s, note for the amount she had advanced towards *620 paying for the land; and that said note was afterwards paid off and taken up by him. To sustain this ground of defense, the following receipt of complainant is relied on:
“Received of Elliott Gass, one note of hand for three hundred and twenty-five dollars, in full of a claim that Hyla Gass paid me on a bond that I executed to Hyla Gass, for a portion of the land where I live, including the house and spring; but as she failed to pay the calls of the bond, I consided the bond null and void. I give my note, for the money that I got of Hyla Gass; and if the bond is ever found, this is to show that it is to be null and void. Given under my hand this 22d of June, 1855. Signed by Hyla Gass, (her mark,) and witnessed by Stephen Ailshire.-’’’
This paper was written by the same witness who wrote the bond, who sáys that he does not know whether it was read over to complainant or not. He proves, also, that he wrote the note for $325; but he does not know that complainant was present,, or that it was delivered to her. He states that the note bears its true date, viz: March 10, 1854, which is more than a year before the bond was dated.
It is apparent that, although the receipt is signed by complainant, it speaks all the way through in the language of defendant, Elliott. It is an acknowledgment by defendant, Elliott, that when he executed the bond, he also executed a note for $325, for money he got from complainant to pay for the land. The note bears date in 1854, when the bond was executed; and this, most probably, is the note referred to by the draftsman *621 of the bond, as a note of complainant. This establishes our conclusion as to the character of the bond transaction. The note then executed was by defendant, Elliott, and not by complainant, as stated by the draftsman of the bond. The receipt proceeds: “But as she failed to pay the calls of the bond, I consider the bond null and void.” This is the language of defendant, Elliott; and to make it binding on complainant, by way of estoppel or otherwise, it was incumbent on defendant to show that it was read to her, and that she signed the paper with an understanding of its terms. Neither the draftsman of the receipt nor the witnesses thereto, state that the paper was read to complainant; and there is no proof that she could read or write. In view of the relation existing between the parties, it was essential that it should appear distinctly, that defendant, Elliott, explained fully to her the purpose and object of the paper, to make it obligatory on her. As this was not done, either by defendant, Elliott, or the draftsman, or the witnesses to the receipt, it can not have the effect of annulling the bond. It remained in full force, and although lost, it could be enforced in a court of equity.
But it is next insisted for defendant, Carter, that the note of $325 was afterwards paid by defendant, Elliott. To establish this ground of defense, the note is adduced with four credits on it, amounting in all to $372 the first dated July 12th, 1858, for $290, and the others dated in 1861 and 1863. The first credit is proven by the same witness who drafted the bond and note; he does not know that the note was ever in complainant’s *622 possession; he indorsed the receipt on it at the request of Elliott and John Gass; saw no money paid; this credit was for $290; does not know that complainant was present. The only proof as to the two next credits, is, as to the hand-writing in which they were indorsed. These two receipts amount to $78. The fourth receipt amounting to $43, was proved by Etter, to be in his hand-writing; that the note was handed him by Elliott Gass’ wife, and he entered the credit, and saw the amount paid in Confederate money, to complainant. It is to be remembered, as already stated, that about the date of the first credit of $290, complainant received $904, the amount of her distributive share in the real estate. It may be further remarked, that on two distinct occasions, after the date of the receipt for $290, defendant, Elliott, is proven to have admitted distinctly that the land was paid for with complainant’s money. In ordinary cases, where the parties are strangers, and are fully competent to contract, and dealing at arm’s length, this proof might be sufficient to establish the defense. But defendant, Elliott, was the trusted son and confidential, agent of complainant. He held and controlled her papers and her money. She was old, paralyzed and speechless, and of weak understanding. A court of equity scrutinizes with jealous vigilance the transactions between parties so related. It not only requires the utmost good faith on the part of the agent, but he is bound to show clearly and distinctly, that he withheld no information, and that the transaction was fully comprehended and freely assented to by complainant. Story Eq., § 321. Tested by this stringent, but *623 just rule, we are constrained to conclude that the defense is not made out. There is no satisfactory proof that the note was ever in possession of complainant, or that she ever saw it, except when the last payment of forty-three dollars, in Confederate money, was made, and it does not appear that she then knew it was her note that was credited. The first credit of $290 was made just about the time that, complainant had received $904 from the Clerk and Master. It was incumbent on de-fendent to show, that Elliott Gass did not use complainant’s own money in getting this credit placed on ’his note. Viewed in connection with other transactions already referred to, the history of this note, and the credits on it, is involved in too much suspicion, to defeat the relief sought by complainant, unless the suspicious circumstances had been clearly explained; and this not having been done, we hold that, as against defendant, Elliott, complainant is entitled to so much of the land as was embraced by the bond.
The last ground of defense, is, that defendant, Carter, is an innocent purchaser of the land for valuable consideration, and without notice of complainant’s prior equity. This defense is not made either by plea or in the answer, as required by law, nor is it sustained by the proof. Although called on by complainant’s bill to exbibit his title, he fails utterly to adduce either the judgment by attachment on which the land was sold, or the judgments of either the first or second redeeming creditors. Nor does he show his own judgments on which he claims to have redeemed, nor the receipt of his immediate assignor for the payment of the claim, *624 nor any evidence, by deed or otherwise, from the Sheriff of his being entitled to the land. All that he does exhibit is his own receipt filed with the Clerk of the Circuit Court, reciting the sale, purchase and successive assignment; all which, unsupported by the evidence of the various judgments, communicate to him no such title as enables him to rely upon the defense of an innocent purchaser for value. At most, he only acquired the equitable title of the original creditor and purchaser, and this being subsequent to the equitable title of complainant, must be postponed to her’s, as to that portion of the land covered by the bond from defendant, Elliott, to complainant. 1 Hum., 491; 6 Hum., 99; 10 Hum., 9; 3 Sneed. 242.
The decree of the Chancellor will be reversed, and a decree rendered divesting out of defendant, Elliott, all his title to that portion of the land covered, by the bond, as appears from the proof, and vesting the same in the heirs of complainant. The title claimed to said portion of the land by defendant, Carter, is declared null and void. The costs of this court and the court below will be paid by defendant.